OPINION OF THE COURT
Emily Pines, J.
This contract action requires the court to determine the interplay between New York’s contract law and federal doctrines governing the general field of patent law. Both plaintiff, MPEG LA, LLC (MPEG) and defendants, Audiovox Electronics Corporation and Audiovox Corporation (Audiovox) move for summary judgment, plaintiff on its contract claims and defendants, to dismiss the same based largely on the federal doctrine of patent exhaustion. Indeed, both have stated, in support of their motions, that they present pure questions of law for the court, which should obviate the need for a trial. Of course, their *805 views of the law diverge, as do their interpretations of the facts presented.
The Parties
MPEG administers and offers patent license agreements covering digital compression technology utilized in consumer digital video products, including DVD players. MPEG and Audiovox entered into a standard portfolio agreement (agreement), which permitted Audiovox to sell and distribute these products utilizing patented technology, via the grant of a royalty-bearing license. The provisions of this agreement, which are at issue in this lawsuit, are as follows:
“2.2 MPEG-2 Decoding Products . . . Subject to the terms and conditions of this Agreement, . . . [MPEG LA] hereby grants to . . . [Audiovox] a royalty-bearing, worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patents in the MPEG-2 Portfolio to make, have made, use and sell, offer for sale or otherwise distribute MPEG-2 Decoding Products . . .
“1.14 MPEG-2 Decoding Product(s) [include] video packaged media playback equipment. . . which . . . decode(s) video information in accordance with the MPEG-2 Standard, and which is Sold.
“1.30 ‘Sale (Sold)’ [is defined in the agreement as] [a]ny sale, rental, license or other form of distribution of an MPEG-2 Royalty Product to an end user, either directly or through a chain of distribution.”
As both parties explain, the agreement permits licensees, such as Audiovox, to contract with other entities for the manufacture of the actual equipment since its terms include “have made” rights. (§ 2.2.)
The agreement requires the licensee to pay royalties, as follows:
“3.1 Royalty. Licensee shall pay to the Licensing Administrator for the benefit of Licensors a running royalty throughout the term of this agreement as follows:
“3.1.1 MPEG-2 DECODING PRODUCT .... The royalty for the sublicense granted pursuant to Section 2.2 hereof shall be four United States Dollars (U S $4.00) prior to January 1, 2002, and two and one half United States Dollars (U S $2.50) thereafter upon the Sale of each end product Manufactured *806 or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent (s) that would be infringed absent a license thereunder, is in force, where the end product is:
“3.1.1.1 An MPEG Decoding Product. . .
“3.2.1 royalties pursuant to this Article 3 are payable upon the Sale of :
“3.2.1.1 Products which allow the end user to decode and/or encode (consistent with the limitations set forth in Section 2.3) MPEG-2 Compliant Bit Streams; provided, however that no royalty shall be payable upon the Sale or distribution of such Products when the Product is incorporated with and used with an MPEG-2 Royalty Product on which a royalty has been paid to the Licensing Administrator ....
“7.11 No Waiver. The failure of either party at any time to require performance by the other party of any provision of this agreement shall not be construed as acquiescence or waiver of such failure to perform such provision. The failure of either party to take action upon the breach of any provision of this Agreement shall not be construed as acquiescence or waiver of any such breach.”
It is undisputed in this case that Audiovox has sold products, mostly DVD players, that are subject to the above provisions and the license agreement in general. Rather, the dispute lies in the meaning of this agreement, by its own terms and when considered in light of the United States Supreme Court decision in the case of Quanta Computer, Inc. v LG Electronics, Inc. (553 US 617 [2008]).
Quanta Decision
In Quanta (supra), the plaintiff, LG Electronics (LGE), licensed patents to Intel Corporation permitting Intel to manufacture and sell, inter alia, microprocessors utilizing LGE patent technology. In a separate agreement, termed the “Master Agreement,” Intel was obligated to inform its customers via written notice that the license it was offering did not extend to a product made by combining an Intel product with a non-Intel product and specifically set forth that a breach of the agreement would not affect the license agreement. Defendant, Quanta, purchased from Intel, products utilizing Intel and non-Intel parts from which it manufactured computers. LGE sued *807 Quanta, asserting that the combination of Intel and non-Intel parts infringed on its patent rights. (Id. at 624.) Quanta argued that, for purposes of application of the “patent exhaustion” doctrine, Intel was “authorized” to sell its products to Quanta; thus, LGE was prevented from further asserting its patent rights against those products purchased from Intel. (Id. at 637.)
The United States Supreme Court, in a unanimous decision by Justice Thomas, held that the long-standing doctrine of “patent exhaustion” limited the patent rights that survive the initial authorized sale of a patented item. (Quanta at 621.) In Quanta, because the license agreement authorized the sale of component parts that embodied the patents at issue, the doctrine of “patent exhaustion” prohibited LGE from asserting its patent rights against Quanta with respect to those patents substantially embodied by the products Quanta sold. The Court reiterated the rule to state that “[a] patented item’s initial authorized sale terminates all patent rights to that item.” (Id. at 618.) Intel’s sale to Quanta exhausted LGE’s patent rights.
In footnote 7 to the Court’s decision it stated as follows: “We note that the authorized nature of the sale to Quanta does not necessarily limit LGE’s other contract rights. LGE’s complaint does not include a breach-of-contract claim, and we express no opinion on whether contract damages might be available even though exhaustion operates to eliminate patent damages.” (Quanta at 637.)
Procedural History
On December 10, 2007, MPEG commenced this action against Audiovox, seeking damages, inter alia, for breach of the parties’ license agreement, and requesting an audit of Audiovox’s sales of products utilizing the MPEG decoding devices for the relevant time period. On June 24, 2009, this court granted MPEG’s prior motion for partial summary judgment seeking to compel Audiovox to submit to an audit; on November 16, 2009, the court denied Audiovox’s motion to renew and reargue MPEG’s request for audit relief. The plaintiffs audit results were set forth in a report dated June 15, 2010 and there appears to be no dispute as to the accuracy of the audit figures. (Nov. 11, 2010 Audiovox response to notice to admit, Brebner aff, pi ex 8, at 4-5.)[1]
*808 While discovery was ongoing, on July 24, 2009, Audiovox brought its first motion for partial summary judgment, seeking to dismiss MPEG’s contract causes of action, based on the doctrine of “patent exhaustion,” as set forth by the Supreme Court in Quanta {supra). On January 5, 2010, the court denied Audiovox’s motion, finding issues of fact, with regard to issues raised by plaintiff in its papers in opposition to the motion concerning whether authorization by MPEG was limited to sales of branded products. This court’s decision and order was affirmed by the Appellate Division, Second Department on May 24, 2011, to the extent of a decision stating that Audiovox “failed to meet its prima facie burden of demonstrating its entitlement to judgment as a matter of law on the first and second causes of action, which allege breach of contract” and finding no need to consider MPEG’s arguments in opposition {MPEG LA, LLC v Audio Elecs. Corp., 84 AD3d 1189, 1190 [2011]).
During disclosure, this court was informed at a discovery conference by counsel for Audiovox, inter alia, that MPEG had changed the wording of its licensing agreement in a patent pool license dated July 2009. Counsel asserted, further, that it had learned during discovery that the new version was designed to replace the licensing agreement at issue in this case (pi ex 2 at 225:17-226:19). This court was not informed of the existence of the new version of the licensing agreement while the original summary judgment motion by Audiovox was pending.
The allegedly relevant portion of the new version of the MPEG licensing agreement provides, as follows:
“MPEG-2 Decoding Products. Upon the Licensee’s payment of applicable royalties due under Article 3 and, subject to other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Patent Portfolio Patents to make, have made, use and Sell or offer for Sale MPEG-2 Decoding Products (i) that bear the brand name that Licensee owns or otherwise has the right to use at Licensee’s discretion or (ii) Sold without a brand-name if the decision to do so is at the discretion of the Licensee. NO LICENSE IS GRANTED UNDER THIS SECTION 2.1 UNLESS AND UNTIL ROYALTIES APPLICABLE UNDER ARTICLE 3 OF THIS AGREEMENT ARE PAID BY LICENSEE.”
The court encouraged the parties to complete discovery and granted Audiovox the right to renew its prior motion based on *809 matters disclosed during the discovery process, including both the new agreement as well as deposition testimony and documents exchanged between the parties.
On June 20, 2011, MPEG submitted its motion for summary judgment, seeking a declaration that Audiovox has breached the licensing agreement as a result of its failure to pay royalties on sales of Audiovox items, utilizing the MPEG decoding devices and judgment in the amount of $9,203,349, plus interest as a result of the audit demonstration that such amount of royalties were not paid by any party for goods sold utilizing the MPEG license. On the same date, Audiovox renewed its prior motion for summary judgment based again on its claim that the language of the parties’ agreement contained no reference to royalties for “branded products” and based on the new version of the MPEG-2 contract, as well as on documentation and testimony elicited during the discovery process and a recent decision of the United States Court of Appeals for the Federal Circuit in Tessera, Inc. v International Trade Commn. (646 F3d 1357 [2011]).
In Tessera (supra), the plaintiff, a licensor of semiconductor computer chip technology, sued a number of its licensees for patent infringement. There was no question that some of the products, which were sold utilizing this technology had resulted in no royalty payments to the plaintiff. The Federal Circuit Court upheld the International Trade Commission’s finding of patent exhaustion, barring the plaintiff’s claim with regard to those products purchased from Tessera’s licensees. Each license agreement contained a clause, similar to the one in the case at bar setting forth: “Subject to the terms and conditions [of this agreement] Tessera hereby grants Licensee a . . . License to the Tessera Patents . . . and to sell . . . and/or offer for sale such . . . Licensed Products.” (Id. at 1362.) “Licensee is licensed only to Licensed Products for which Licensee or a third party has satisfied a royalty obligation.” (Id. at 1363.) The Federal Circuit Court rejected Tessera’s argument that a sale was not authorized under the patent exhaustion doctrine unless and until royalties had been paid. In rejecting this argument, the Federal Circuit Court stated that “[tjhere is nothing in any of the license agreements to even remotely suggest that the existence of a condition subsequent, namely, the payment of royalties, operates to convert initial authorized sales into unauthorized sales for purposes of patent exhaustion.” (Id. at 1370.) The court went on to state that Tessera would still be in a posi *810 tion to enforce whatever contractual rights it had to receive royalties. {Id. at 1369.)
Both motions raise significant issues, which are often intertwined, concerning the meaning of the parties’ agreement, the interplay between contractual rights and the doctrine of patent exhaustion, as well as the actions of the parties dehors the litigation in their dealings with each other and other entities. Accordingly, in order to provide full consideration of the serious issues raised, the court grants Audiovox renewal of its prior motion for partial summary judgment pursuant to CPLR 2221 (e).
Audiovox’s Motion to Renew
Audiovox argues that information obtained during the discovery process now demonstrates that it is entitled to judgment as a matter of law, dismissing plaintiffs breach of contract causes of action. As stated in its earlier motion, defendant’s legal claim is based upon the theory that the doctrine of “patent exhaustion” terminates all patent rights to a particular item so long as the item was transferred by an entity in an initial “authorized sale.” Once the DVD players at issue were sold by one of MPEG’s licensees, having the identical license “[tío make . . . use, and sell ... or otherwise distribute” their products, the right of MPEG to claim entitlement to royalty payments, based on the identical license agreement was finished.
According to Audiovox, MPEG cannot now claim that its 2003 agreement with Audiovox required “brand owners” to pay royalties before any license attached, nor that the license’s effect was delayed pending MPEG’s receipt of a royalty payment, nor that the word “sell” contained in paragraph 2 had any relation to the term as utilized in paragraph 3 because MPEG rewrote the agreement during the course of this litigation. Now, the license agreement, for the first time, states that the license only takes effect upon the payment of specified royalties; restricts the license to companies, such as Audiovox, that sell branded items; and capitalizes the letter “S” in the word “Sell” in the new section 2 for the first time to make that word applicable to the definition of the term in section 1.30; and also alters the definition of the term “Sale” to encompass only products sold “by Licensees” to “End Users.”
In addition, Audiovox asserts that MPEG’s CEO admitted during discovery that “sell” as used in the 2003 agreement without capitalization, did not refer to the defined term “Sell,” *811 set forth in section 1.30 and, thus, only means the exchange of a product for money from a buyer. (Def ex 1 in support at 629-630.)[2] Thus, Audiovox argues that MPEG’s reading of the agreement, limiting “sales” (and thus authorization) to those transactions that constituted transfer of a product directly to the “end user” as discussed in paragraph 3 of the agreement, is completely irrelevant to the authorization of the sale required to invoke the doctrine of “patent exhaustion.” Audiovox also asserts that documents produced during discovery demonstrate that under MPEG’s “business plan,” target licensees were named as ‘ ‘ [m] anufacturers of consumer electronic equipment” not just brand owners (def ex 6 in support at 651:11-656:3; def ex 35 in support at 8). In addition, a 1997 letter from MPEG’s CEO, published on its Web site, states that most MPEG suppliers had executed the license without in any way limiting the term “supplier” to those which sold brand products (def ex 6 in support at 288:5-289:8; def ex 36 in support at 15). Such argument is further supported, according to Audiovox, by the examination before trial testimony of MPEG’s royalty specialist, who stated that all licensees, not just brand companies like Audiovox, were responsible for paying royalties; and that the benefit of the license is not contingent upon the condition precedent of payment of the royalty (def ex 7 in support at 17:7-10, 112:19-113:3, 115:11-17).
Audiovox argues that its interpretation of the parties’ license agreement is further borne out by the Federal Circuit Court’s recent decision in Tessera v International Trade (supra).
That case, in addressing the issue of whether the patent exhaustion doctrine applies where royalty payments are due and the license is granted “[s]ubject to the terms and conditions of the agreement” in terms almost identical to the agreement herein (646 F3d at 1362), found that the patent holder’s argument that the sale is initially unauthorized until the holder receives the royalty payment to be “[hjollow and unpersuasive.” (Id. at 1370.) The court rejected, as an “[ajbsurd result” the suggestion that a licensee’s sale could become unauthorized at some point in the future if the licensee failed to pay a royalty. (Id.) Based on the recent Tessera determination, Audiovox opines that any arguments made by MPEG with regard to the meaning of paragraph 2 of the parties’ agreement has been squarely rejected.
*812 Upon renewal, Audiovox claims, in addition, that discovery has demonstrated that MPEG makes no effort to determine if the royalties it collects are for branded products or for a company that controls a brand and that the template MPEG provides its licensees leaves no ability nor provides any requirement for such information to be provided. (Def ex 7 in support at 51:18-53:9, 59:22-60:4, 64:5-11, 145:11-17.) Accordingly, MPEG has collected billions of dollars without providing itself any manner of determining whether the monies are paid for branded products or products being sold to end users, both MPEG’s purported requirements for a sale to come within the ambit of being authorized and subject to the doctrine of “patent exhaustion.”
Although Audiovox does not believe that any of the license agreement terms are ambiguous or that the court need consider such in light of MPEG’s conduct, it asserts that an ambiguity, if such exists, must be construed most strongly against the party that prepared it and favoring the entity that had no voice in the selection of the terms under the doctrine of “contra proferentem.” (Jacobson v Sassower, 66 NY2d 991 [1985].)
MPEG opposes Audiovox’s summary judgment motion on numerous grounds. As stated in its memorandum of law in opposition, Audiovox is basing the current motion on the same basic arguments rejected both by this court and the Appellate Division regarding “Audiovox’s former motion.” MPEG asserts further that even if the court were to consider this second motion for summary judgment, a close view of the contract as well as Audiovox’s own interpretation thereof in the past demonstrates that only Audiovox’s sales of its DVD players to the end user are “authorized” and subject to the patent exhaustion theory; sales by Audiovox’s suppliers simply are not. During discovery, for example, Audiovox’s CEO admitted that Audiovox and not its suppliers “sell[s]” the licensed products to the “end users,” which are the consumers. (PI ex 17 at 30:5-10.) In addition, MPEG points to a recently decided case by the Federal Circuit Court, Princo Corp. v International Trade Commn. (616 F3d 1318 [2010]), stating that the federal doctrine only applies to sales that comply with the license. Thus, a sale by one of Audiovox’s suppliers upstream is simply not covered by the license agreement as one where the license applies and does not exhaust the patent rights of MPEG.
MPEG reads the license agreement differently than Audiovox, in that MPEG, which also believes the agreement to be *813 clear, states that it is irrelevant whether the “license grant” set forth in section 2.2 of the agreement uses the defined word “Sale” or the word used generally as “sale” or “sell” because the key provision is not the sale but the product mentioned in that section that is to be sold — i.e., the “MPEG-2 Decoding Product.” Under the express terms of the agreement, the decoding product is defined as one that is “Sold.” Thus, the definition of the word “Sold” as used in the agreement is invoked and, as set forth in section 1.30, “Sold” is limited to a product to “[a]n end user . . . directly or through a chain of distribution.” Contrary to Audiovox’s position, MPEG argues that the royalty-bearing grant of license in section 2.2 carries with it the concomitant obligation to pay royalties in accordance with article 3 of the agreement. Thus, the license grant to Audiovox, according to MPEG, is conditional, and, as the Federal Circuit Court stated in its recent opinion in Princo (supra), the doctrine of patent exhaustion cannot be invoked when the phrase utilized in the suppliers’ license agreements applies to their sales to Audiovox, clearly not the consumer nor an end user in any way shape or form.
In addition, MPEG asserts that the agreement expressly provides that the license is, by its terms “[s]ubject to the terms and conditions of the Agreement,” creating an express condition, in this case the payment of royalties, before any license can be granted. The fact that MPEG reads the agreement as requiring royalties to be paid as a condition to the license and that it is uncontested that a minimum of over $9 million in royalties have not been paid, destroys any ability to invoke the “patent exhaustion” doctrine.
MPEG further argues that should the court feel it necessary to look to extrinsic evidence, such will demonstrate that Audiovox has not behaved in the past in accord with its current theory. Thus, Audiovox did not report and pay royalties based on whether its supplier was or was not licensed by MPEG. Rather, MPEG states that the audit demonstrates that Audiovox consistently underpaid and underreported its sales of MPEG products. According to MPEG, when it contacted Audiovox in 2006 to complain about underreporting of licensed products, a series of communications between Audiovox and its major licensed supplier, Action Electronics Co., Ltd. (Action), demonstrates that the two companies had been operating under an “understanding” that allowed Audiovox to pay its supplier less than it would have had Audiovox been paying MPEG the full royalty due *814 under the agreement (pi ex 27 at AVX 427). MPEG points to a series of correspondence between Audiovox and its supplier, including one where Audiovox considered changing the brand name on its products to avoid attracting MPEG’s attention (pi ex 29 at AVX 2877).
MPEG points to further correspondence demonstrating that as early as 2003, Audiovox knew and admitted to these suppliers that Audiovox, and not they, were responsible for payment of royalties (pi ex 37; pi ex 25 at 31:6-7, 51:20-52:16, 53:2-12). MPEG refers to its own memorandum of understanding (MOU), entered in October 2004 with Chinese manufacturers, which specifies that if company A manufactures a DVD player for company B, which then uses the company B brand name to sell the DVD players in the market place, company B will be responsible for the royalty (pi ex 41 at MPEG LA 55572). MPEG asserts that it has obtained evidence that Audiovox was aware of this MOU certainly by mid-2006 (pi ex 42).
With regard to this extrinsic evidence, MPEG claims that while Audiovox clearly knew that it was responsible for payment of royalties on these DVD players, MPEG’s behavior was also consistent with such knowledge. MPEG points to a series of correspondence with potential licensees, informing them that the “Sale” to the end user was the act that triggered the obligation to pay and the right to receive the royalty (pi ex 46 at MPEG LA 1769; pi ex 48 at MPEG LA 8948).
MPEG states that it did not hide the new agreement; but rather issued a press release and publicly announced its existence on its Web site (pi ex 50). With regard to the Audiovox assertion that MPEG’s record keeping belies its interpretation of the agreement, MPEG begs to differ, as it asserts that the reporting and payment of royalties are required, as it has argued, at only one point in the distribution cycle; i.e., the sale to the end user. Thus, MPEG has no reason to collect information before the transaction occurs that entitles it to payment.
Finally, with regard to the doctrine of “contra proferentem,” construing the agreement against its author, MPEG points to the specific provision of the parties’ agreement which states that
“[e]ach party has been represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated at arms length, with the advice and participation of counsel, and prepared at the joint request, *815 direction, and instruction of the parties, and shall be interpreted in accordance with its terms without favor to any party.”
Thus, according to this paragraph, MPEG argues that the terms of the agreement specifically exclude “contra proferentem” and it does not apply.
MPEG’s Motion for Summary Judgment
MPEG has also moved for summary judgment pursuant to CPLR 3212, on its breach of contract claims against Audiovox for failure to report and pay royalties due and seeks an order requiring Audiovox to pay MPEG royalties for those products sold for which it is undisputed, as a result of the audit, that no royalties have been paid.
The first premise of plaintiffs argument is that while patent exhaustion may be a defense to a claim of patent infringement, it is not a defense to a breach of a patent license agreement. Under the agreement offered by MPEG, the contractee is offered the ability to license a combination of hundreds of patents, which the users of such technology would otherwise be required to and still can negotiate for and obtain from one or all of the separate patent owners, since they maintain their individual rights to license and enforce their portfolio patents. As set forth in MPEG’s arguments in opposition to Audiovox’s renewed motion for summary judgment, the plaintiff points to the language of the agreement, arguing that the provisions of the license grant in section 2.2 are only available to allow the licensee to sell decoding products. The decoding products, again, are limited to items that are “Sold” and “Decoding Products” require the payment of a specified royalty (§ 3.1) upon the sale of the end product. This same agreement provides for interest when such royalty payments are late (§3.7). Section 3.3 of the agreement mandates periodic reporting by the licensee and violations of the payment and reporting provision are considered a material breach of the agreement (§ 6). As a result of the audit ordered by this court, MPEG asserts that Audiovox has failed to report more than six million MPEG royalty products sold by Audiovox between 2000 and 2009. Taking Audiovox’s word that certain of its suppliers paid royalties on some of these products, the audit, according to MPEG, demonstrates that -$9,203,349 have not been paid by any party and are, thus, due and owing MPEG pursuant to the parties’ contract.
According to MPEG, the contract itself contains no excuse to the licensee, eliminating the payment of royalty requirement *816 for goods sold to the end user, when the licensee’s supplier has entered into an agreement with similar terms. The only-contractual provision excusing Audiovox’s responsibility from payment when it sells goods to an end user is when “(a) royalty has been paid” (§ 3.2.1.1). Pointing to a post-Quanta Federal Circuit Court decision, MPEG argues that the doctrine of patent exhaustion, even if applicable (which it denies) will not excuse the licensee’s breach of contract. MPEG refers to ExcelStor Tech. Inc. v Papst Licensing GmbH & Co. KG (541 F3d 1373 [Fed Cir 2008]) in which the Court of Appeals having exclusive jurisdiction over matters of patent law stated that “[p]atent exhaustion prohibits patentees from enforcing patent rights in certain circumstances, but it does not forbid multiple licenses on a single product or even multiple royalties.” (ExcelStor at 1377.)
In ExcelStor (supra), the court was asked to determine whether the doctrine of patent exhaustion, raised on behalf of a licensee, stated a cause of action and whether such invoked the exclusive jurisdiction of the federal court. In that matter, the licensee asserted that the licensor of patented computer hard disk drives violated the doctrine since the licensor allegedly collected two sets of royalties from the same patented product, committed fraud and breached the contract between licensee and licensor. (Id. at 1375.) The court found no federal cause of action arose by assertion of the patent exhaustion doctrine; that the doctrine is designed to prohibit patent holders from invoking patent law to control post-sale use of the patented item; and that the patent exhaustion doctrine does not forbid multiple licenses nor multiple royalties. (Id. at 1377.) The court went on to state that the issues of fraud and breach of contract were properly relegated to the state courts. (Id.) Accordingly, under the law and the facts as they exist in this matter, the doctrine set forth by Audiovox provides no excuse for that party to breach its agreement with MPEG.
Second, MPEG states that the exhaustion doctrine, where it does apply, is only utilized to prohibit the patentee’s use of the subject device where the royalty, i.e., the bargained-for benefit, has been paid, citing Princo Corp. v International Trade Commn. (616 F3d 1318 [2010]). Since, as MPEG argues, there is no dispute that at least somewhat over $9 million in royalties for the MPEG licensed products sold by Audiovox have not been paid, application of the doctrine which is at least partly based on consideration having been forwarded to the patent holder, *817 makes little sense. (See Mitchell v Hawley, 83 US 544 [1872]; Union Tool Co. v Wilson, 259 US 107 [1922].)
MPEG sets forth that Audiovox cannot escape the nonpayment issue by its alternative claim that prior sales of component parts to Audiovox suppliers for products ultimately sold to Audiovox come within the ambit of the parties’ agreement which provides Audiovox with a limited royalty free license for “MPEG-2 Intermediate Products.” Such royalty exclusion provision cannot apply, as per MPEG, because the language of the parties’ contract forbids it when the entity asserting it is a customer of the intermediate product licensee. Thus, section 2.1 of the agreement provides: “No license is granted herein, by implication or otherwise, to customers of licensee to use MPEG-2 intermediate products manufactured or sold by Licensee.”
In addition, MPEG alleges that Audiovox has set forth no evidence that any supplier of these supposed components ever provided the required notice to MPEG (agreement § 2.6) and discovery demonstrates that all of the sales of these component parts occurred outside the United States and are simply not the subject of the license agreement between the parties hereto (pi ex 7 at 130:21-131:4).
Regarding the various affirmative defenses set forth by Audiovox in relation to the breach of contract causes of action, MPEG argues that such are conclusory and unsubstantiated. Thus, the MPEG Web site of licensees in good standing cannot be relied upon by Audiovox to alter the clear terms of its agreement requiring the payment of royalties, nor did such Web site information contain false information. The affirmative defense of “unclean hands” is insufficient because MPEG’s unsubstantiated actions in the marketplace will not excuse Audiovox from compliance with its clear obligations. MPEG states that assertion of the affirmative defense of waiver cannot stand because there is no evidence that MPEG intentionally relinquished its right to seek royalties from sales by Audiovox of MPEG products. With regard to the affirmative defense of failure to mitigate damages, MPEG claims that such is based on MPEG’s return of a “paltry” sum to Action, that had been tendered by that party in the context of a settlement negotiation and MPEG has clearly taken reasonable measures to ascertain and collect the amount of royalties owed.
Audiovox opposes MPEG’s motion for summary judgment, arguing that the clear language of the parties’ contract confirms *818 that royalties are due only when MPEG’s patents would be infringed absent a license. Thus, Audiovox cannot be sued for breaching a contract containing terms to which it never assented; i.e., payment of royalties for the resale of products that MPEG had already licensed. As set forth in its own motion for summary judgment, the unambiguously “authorized” sales from Audiovox’s licensed suppliers exhausted MPEG’s ability in any way to control the post-sale use of such items, citing Quanta. Second, Audiovox contends that contract law aside, a patentee has no authority to utilize a royalty agreement to extend the useful life of a patent, citing Brulotte v Thys Co. (379 US 29 [1964]). In Brulotte (supra), the Supreme Court held that licenses for the use of patented machines sold to farmers were invalid and the royalty payments required thereunder improper, where the last patents incorporated within such machinery had expired and any attempt to resurrect the monopoly was contrary to public policy. (Id. at 31.)
With regard to MPEG’s assertion that a royalty payment must be actually received in order to invoke the patent exhaustion doctrine, Audiovox sets forth that not a single case in the past 150 years has so held and that relevant cases, as most, recently set forth in Quanta, state only that the sale be “authorized.” Citing United States v Univis Lens Co. (316 US 241 [1942]), Audiovox argues that such case recognized that once a patented item is sold in an authorized manner, it is protected against all unwarranted extensions of the monopoly power and the manner in which such is sought to be extended is immaterial. (Univis at 251, 252.)
In addition, Audiovox claims that MPEG’s reliance on the recent en banc decision in Princo Corp. v International Trade Commn. (supra) is misplaced as that case involved a defense of “patent misuse” as opposed to “patent exhaustion” and was not concerned with the patentee’s compensation; but, rather, with ensuring that patentees did not unlawfully extend their monopolies:
“The doctrine of patent misuse is thus grounded in the policy-based desire to ‘prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right.’ ” (Princo at 1328.) MPEG’s further reliance on ExcelStor Tech Inc. v Papst Licensing GmbH & Co. KG (supra), is also misplaced, according to Audiovox, as that case recognized that patent exhaustion can, in fact, be raised as a defense to a state law nonpatent claim, without creating federal *819 subject matter jurisdiction, so long as such is raised only as a defense in the action. (ExcelStor at 1376.) In any event, Audiovox has in the past and continues to assert that it did, in fact, pay consideration through its payment to the MPEG authorized licensees for the use of the product purchased.
Audiovox asserts, further, that there is no consideration under a contractual analysis to support MPEG’s theory because if it has no license to sell these products, it would not be liable for patent infringement if it purchased such products from a licensed supplier. Thus, Audiovox claims MPEG’s contract theory attempts to divest Audiovox of protection otherwise afforded by the patent exhaustion doctrine. Again, as in its own motion for summary judgment, Audiovox points to the license agreement itself to demonstrate that the grant to MPEG’s licensed suppliers, in language almost identical to the agreement in this case, specifically exhausted MPEG’s ability to collect any royalties on the subsequent resale of products where the patent has been exhausted (citing Quanta at 638). To the extent that footnote 7 of the Quanta decision (at 637) made reference to the fact that it was not considering a breach of contract claim, Audiovox argues that the only such claim extant in that case was on the issue of notice required of Intel in its separate contract with LGE and had nothing to do with Quanta. Such a separate issue does not exist in the case at bar.
With regard to MPEG’s assertion that sale of deck mechanisms (component parts) from MPEG licensed intermediate product manufacturers could not have exhausted any relevant patents, Audiovox claims that section 2.1 of the MPEG licensing agreement available to all suppliers authorizes vendors to “sell” such products, again invoking the doctrine of patent exhaustion. With regard to the notice provision contained in section 7.16.1, Audiovox asserts that MPEG has waived such by failing to enforce it in the past. Finally, Audiovox disagrees with MPEG’s assertion that such intermediate products are not sold in the United States, since the products were always destined for and ultimately sold in the United States.
According to Audiovox, its affirmative defenses, set forth in response to the breach of contract causes of action, are sufficient to deny MPEG’s motion should the court agree with the plaintiff that patent exhaustion is not a defense to the breach of contract. Audiovox reiterates the allegations set forth in support of its own motion; i.e., MPEG’s continuous public and private behavior prevents it from taking the opposite position *820 herein. Thus, MPEG’s own CEO has stated during discovery that the Web site list of “licensees in good standing” was updated constantly and conveyed that these entities had paid their royalties. (Def ex 3 in opposition at 601:412.) In a 2003 e-mail, MPEG informed Audiovox that “[a]ny company that makes MPEG-2 products needs the essential patent rights the Licensee provides [and that] License enables users to clear patent rights before making products.” (Def ex 41 in opposition.) Audiovox was, in its opinion, entitled to and justifiably did, rely on such assertions to its detriment in this litigation.
MPEG is also subject to the doctrine of “unclean hands,” according to Audiovox, since it offered licenses to entities in multiple positions in the chain of commerce, perpetuated an environment designed to promote confusion and did nothing to prevent the collection of more than one royalty for the same product. MPEG’s failure to ascertain which royalties were paid by whom and for which products, combined with its Web site, listing them all as in good standing, acts, as per Audiovox, as a waiver of MPEG’s rights to insist on collection of royalties based on contractual liability if it exists. Finally, with regard to the defense of a failure to mitigate damages and the import of MPEG’s return of the monies to Action, such merely creates a question for the trier of fact and cannot be dismissed on a summary judgment motion.
Summary Judgment/Contract Law/Patent Exhaustion
New York established the summary judgment tool in 1921; and since that time, it has proved invaluable in providing a practical solution for resolving those litigations that involve solely questions of law. (See Merritt Hill Vineyards v Windy Hgts. Vineyard, 61 NY2d 106 [1984].) CPLR 3212 permits a party to demonstrate that there exists no material issue of fact to be tried and that judgment may be directed as a matter of law; thus, where appropriate, summary judgment provides a significant benefit both to the parties and to the overburdened New York trial courts. {Brill v City of New York, 2 NY3d 648 [2004].)
The meaning of a contract is generally a question of law, and, therefore, appropriate for summary judgment; however, where a term or clause within such contract is ambiguous and determination of the parties’ intent depends on items such as credibility and/or extrinsic evidence of the parties’ intent, then the issue becomes one for the trier of fact and not one to be *821 determined in the context of a pretrial motion. (Amusement Bus. Underwriters v American Intl. Group, 66 NY2d 878 [1985]; Noho Light. & Elec. Supply Co., Inc. v Simon, 45 AD3d 391 [1st Dept 2007].)
A contract is considered clear if, on its face, it is reasonably susceptible to only one meaning. (White v Continental Cas. Co., 9 NY3d 264 [2007]; Greenfield v Philles Records, 98 NY2d 562 [2002].) On the other hand, a contract will be held ambiguous where on its face, it is reasonably susceptible of more than one interpretation. (Chimart Assoc. v Paul, 66 NY2d 570 [1986].) This determination is made by examining the entire agreement and considering the relation of the parties as well as the circumstances under which the contract was executed, with the words themselves to be construed in connection with the obligation as a whole and the intention of the parties as manifested by such obligation. (Riverside S. Planning Corp. v CRP/Extell Riverside, L.P., 13 NY3d 398 [2009].) While ambiguity as to the meaning of the terms and the intent of the parties may indeed raise an issue for the jury as trier of fact, the initial determination on whether a writing is, in fact, ambiguous is the exclusive province of the court. (Innophos, Inc. v Rhodia, S.A., 10 NY3d 25 [2008].)
When the meaning of a written agreement is plain and clear, it is entitled to be enforced according to its terms. (Vintage, LLC v Laws Constr. Corp., 13 NY3d 847 [2009]; Samuel v Druckman & Sinel, LLP, 12 NY3d 205 [2009]; Greenfield v Philles Records, supra.) A fundamental tenet of contract law is that agreements are to be construed in accordance with the intent of the parties and the best evidence of such intent is what is expressed in their written agreement. (Goldman v White Plains Ctr. for Nursing Care, LLC, 11 NY3d 173 [2008].) However, the court, in interpreting a contract, must, as stated, give its primary attention to the purpose of the parties in making the contract. (Greenfield v Philles Records, supra.) In addition, all parts of the agreement must be read in harmony to determine the meaning. (Matter of Bombay Realty Corp. v Magna Carta, 100 NY2d 124 [2003].)
When interpreting a business agreement, the tests to be applied are both common speech and the reasonable expectation and purpose of the ordinary business person in the factual context in which terms of art and understanding are used; however, this must be keyed to the level of sophistication and business acumen of the particular parties involved. (BP A.C. Corp. v One Beacon Ins. Group, 8 NY3d 708 [2007].)
*822 As set forth by Justice Thomas in the Quanta case, federal courts have applied the doctrine of “patent exhaustion” for over 150 years in order to limit the rights of the patent holder so that they do not survive the initial “authorized sale” of a patented product. (Quanta at 621.) The Federal Circuit Court sitting with exclusive federal Court of Appeals jurisdiction over matters of patent law, and which counsel for both parties have insisted that this court must heed, has reiterated Justice Thomas’ definition, setting forth that the exhaustion doctrine is designed to prevent patent holders from reaching out to control a post-sale use of such article in commerce. (.ExcelStor at 1376.) Quanta, in the kind of footnote that appellate courts love and constitute the bain of the trial court’s existence, declines to opine on whether the defense of patent exhaustion can be used in a lawsuit not for patent infringement (clearly the province of the federal courts); but, rather, for breach of the parties’ contract. (Quanta at 637 n 7.) In Tessera, which strongly rejected the patent holder’s use of language such as “Subject to the terms and conditions [of this agreement]” as providing a release from the doctrine where royalties have not been paid, still reminds the reader that “Tessera still may pursue any number of other avenues to enforce its contractual right to receive royalties. These include an action for breach of contract.” (Tessera at 1369.)
Based on these provisos as well as the statement in ExcelStor that the doctrine of patent exhaustion does not forbid either multiple licenses or even multiple royalties (.ExcelStor at 1377), this court is convinced that the doctrine of patent exhaustion, even if it is applicable as a defense to the contract herein, does not prevent a party, which happens to be patent holder, from suing its licensee for breach of the parties’ contract. However, that ruling leads to the next question, which is whether patent exhaustion can ever be a defense to a contract, and whether it would qualify as a defense in the case at bar.
A review of the contract terms convinces the court to answer both questions in the affirmative. Contracts, under New York law, require a demonstration of assent to their terms and consideration. (Kowalchuk v Stroup, 61 AD3d 118 [1st Dept 2009].) The consideration offered by MPEG as well as that offered by Audiovox and the acceptance of such by both parties is set forth in the license agreement in section 3.1.2: “The royalty for the sublicense granted . . . shall be . . . (U.S. $2.50) . . . upon the Sale of each end product Manufactured or Sold in a *823 country in which . . . MPEG Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force . . .
Accordingly, while the court agrees with MPEG that patent exhaustion is not always a defense to a breach of contract, the court also agrees with Audiovox, that it can be and certainly could be in this case, since the payment of royalties (the consideration provided by Audiovox herein) is in exchange for the ability to engage in commerce without infringing on the patent rights of the products Audiovox is selling in this case. However, the fact that patent exhaustion could be a defense to a contract action, in the case at bar, does not mean that it is.
The License Agreement
Reading the relevant contract provisions together, as is required, the court finds that in all material respects, as set forth in an examination of the record on this motion, they are clear. As set forth above, MPEG grants Audiovox a license to “make, have made, use and sell, offer for sale or other wise distribute MPEG-2 Decoding Products” (§ 2.2). MPEG-2 decoding products are defined at section 1.14, as “video packaged media play back equipment . . . which is Sold.” “Sale (Sold)” is defined as “[a]ny sale ... or other form of distribution of an MPEG-2 Royalty Product to an end user either directly or through a chain of distribution. . . . [A] Sale under this Section 1.30 shall be deemed to take place in a country where an end user takes delivery.”
Based on a consideration of this language as a whole, the court finds that the only sale of DVD players (MPEG-2 decoding products) which are “authorized” under the agreement are those that are delivered to an end user.[3] As both MPEG and Audiovox have set forth to the court in their current motions that the precise language is contained in the license agreements provided to Audiovox’s overseas suppliers, such sales are not “authorized” under the agreement for purposes of application of the patent exhaustion defense to a breach of contract claim. MPEG has also submitted evidence that, based on its audit, it has not been paid royalties of over $9 million. Since the court *824 has determined that the license agreement, when read as a whole, clearly sets forth the rights and obligations of the parties in accordance with the interpretation set forth in MPEG’s motion for summary judgment; that is, that the only relevant “authorized sales” under the license agreement are those of the MPEG decoding device to the end user in the chain of distribution, it refrains from consideration of extrinsic evidence set forth in Audiovox’s motion to renew and upon renewal, denies Audiovox’s motion for summary judgment.
The court finds Audiovox’s alternative argument, that it received products from other licensees that sold component parts and is entitled to the royalty payment exception in the licensing agreement, unconvincing, since the agreement clearly sets forth that such will not be available to those entities that are customers of the intermediate product licensee (§ 2.1). In addition, the court need not apply the doctrine of contra proferentum, where it has found the parties’ meaning within the terms of their contract. In any case, such would be unlikely to apply to parties as sophisticated as those herein.
Summary Judgment/Affirmative Defenses
To obtain summary judgment, the moving party must make a prima facie showing of entitlement to judgment as a matter of law, offering sufficient evidence to demonstrate the absence of any material issues of fact. (Goldberger v Brick & Ballerstein, 217 AD2d 682 [2d Dept 1995].) The burden then shifts to the party opposing the motion to come forward with proof in admissible form demonstrating that there are genuine issues of material fact which preclude the granting of such relief. (Zayas v Half Hollow Hills Cent. School Dist., 226 AD2d 713 [2d Dept 1996].)
Based on the above findings, the court finds that MPEG has demonstrated prima facie entitlement to summary judgment on its breach of contract claims for unpaid royalties for those products sold under the license agreement by Audiovox to end users. Upon the shifting of the burden, the court considers the affirmative defenses raised by Audiovox in response to MPEG’s motion.
Equitable estoppel is a doctrine imposed by the law in the interest of fairness in order to prevent the enforcement of contractual rights which would result in imposing an injustice upon an entity against which the enforcement is sought. It requires a showing that such entity, in justifiable reliance upon *825 the other party’s words or conduct, has been misled into action upon the belief that enforcement would not be sought. (Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d 96 [2006].) The doctrine requires a demonstration that the party asserting it was actually misled by another’s conduct or that it significantly and justifiably relied on such conduct to its disadvantage. (Id. at 106.) The defense of equitable estoppel may also be invoked where the failure to assert a right in a prompt fashion has given rise to circumstances rendering it inequitable to permit the exercise of the right after a lapse of time. (Matter of Charles v Charles, 296 AD2d 547 [2d Dept 2002].)
Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned. (Fundamental Portfolio Advisors, supra.) Abandonment of contractual rights may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage; however, waiver should not be lightly presumed and must be based on clear manifestation of intent to relinquish contractual protection. (Id.) The existence of an intent to forego a contractual right is generally a question of fact. (Id.)
As set forth in Audiovox’s response to MPEG’s motion for summary judgment, it has set forth sufficient evidence to meet its burden that the issues of waiver and equitable estoppel should be presented to the trier of fact. As set forth above, Audiovox has argued that MPEG’s CEO testified that the Web site list of licensees in good standing was updated continuously and was meant to display which entities had paid their respective royalties (def ex 3 in opposition at 60:4-12). Audiovox has claimed that this was the only available source to those licensees, like Audiovox, regarding MPEG’s other licensees. Audiovox is entitled to demonstrate at trial that it relied on the statements made by MPEG to its financial detriment in paying millions of dollars to its suppliers such as Action. This same Web site, on which Audiovox states it relied announced that the MPEG license was “[t]o provide coverage to all licensees for all of their MPEG-2 Products” which were described to include “DVD players.” (Def ex 43 in opposition at 1-2.) In addition to the Web site, the aforementioned 2003 e-mail from MPEG to Audiovox stating that “[a]ny company that makes MPEG-2 products needs the essential patent rights the License provides” and that the “[L] Ícense enables users to clear patent rights before making products” (def ex 41 in opposition), raise issues *826 of fact concerning Audiovox’s reliance on such statements to its economic detriment. These same statements, along with the allegation that MPEG failed to distinguish those products for which royalties were actually paid provide the trier of fact with issues to determine on both the equitable estoppel and waiver defenses. MPEG has opposed these defenses by pointing to other memoranda and statements, but such only raise issues for the trier of fact.
With regard to the defense of failure to mitigate damages, Audiovox raises properly the issue of whether MPEG’s refusal to accept the payments (allegedly in the amount of $773,347) from a major Audiovox supplier, Action, for Audiovox products was reasonable, something this court cannot determine on motion at this stage. However, with regard to the issue of “unclean hands” there is nothing submitted that rises to the level of immoral, unconscionable conduct required to establish this defense. (See Brown v Lockwood, 76 AD2d 721 [2d Dept 1980].)
Accordingly, upon the shifting of the burden, Audiovox has set forth sufficient demonstration of issues of fact in support of three of its affirmative defenses to support this court’s denial of MPEG’s motion for summary judgment.
In sum, the court grants Audiovox renewal of its prior motion for summary judgment and upon renewal, denies it partial summary judgment, as Audiovox has not demonstrated as a matter of law that patent exhaustion is a defense to the license agreement between the parties herein. Second, the court finds that MPEG has sustained its burden of demonstrating entitlement to summary judgment on its breach of contract claims based on the wording of the agreement, irrespective of the “branding” argument made in the prior motion. Third, on the shifting of the burden, the court finds that Audiovox has sustained its burden of demonstrating material issues of fact permitting it to go to trial on the issues raised in its affirmative defenses of equitable estoppel, waiver and failure to mitigate damages.

. References to “pi ex” are to the exhibits submitted by MPEG on these motions.

. References to “def ex” are to exhibits submitted by Audiovox in connection with these motions.

. The court’s January 5, 2010 order did not accept MPEG’s prior argument that only “branded products” need be licensed as the word was not found in the agreement. As MPEG did not cross-move for summary judgment in the prior motion, the court did not search the record at that point to determine whether MPEG was entitled to judgment as a matter of law on other grounds.