# United States Court of Appeals for the Federal Circuit

---

**LELO INC., LELOI AB,**
*Appellants*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**STANDARD INNOVATION (US) CORP.,**
**STANDARD INNOVATION CORPORATION**
*Intervenors*

---

2013-1582

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-823.

---

Decided: May 11, 2015

---

HECTOR JULIAN RIBERA, Fenwick & West LLP, Mountain View, CA, argued for appellants. Also represented by MARION N.G. MILLER; LAUREN ESTELLE WHITTEMORE, San Francisco, CA.

MICHAEL HALDENSTEIN, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee. Also represented by DOMINIC L. BIANCHI, JAMES A. WORTH.

PAUL WHITFIELD HUGHES, Mayer Brown LLP, Washington, DC, argued for intervenors. Also represented by GARY HNATH; ROBERT P. LORD, LISA E. MARGONIS, TAMMY J. TERRY, CARLYN ANNE BURTON, Osha Liang LLP, Houston, TX.

---

Before MOORE, CLEVENGER, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

Appellants appeal the finding of the U.S. International Trade Commission that the domestic industry requirements of § 337 were satisfied upon a showing of a "significant investment in plant or equipment" and a "significant employment of labor or capital."[1]  *See* 19 U.S.C. § 1337(a)(3).  Because the ITC's domestic industry analysis and determination was based on qualitative factors, we *reverse*.

## BACKGROUND

Standard Innovation Corporation ("Standard Innovation"), founded in 2004 and headquartered in Ottawa, Canada, is the assignee of U.S. Patent No. 7,931,605 (the '605 Patent).  Standard Innovation markets a line of kinesiotherapy devices that includes three models that it asserts practice certain claims of the '605 Patent.  In September 2009, Standard Innovation formed a U.S. subsidiary, Standard Innovation (US) Corp., ("Standard U.S.") to distribute products in the United States.

Neither Standard Innovation nor Standard U.S. manufactures in the United States.  Standard Innovation

---

[1]    *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op. at 2 (June 17, 2013) ("*Comm'n Op.*")

sources parts and components for its devices from third-party suppliers in the U.S. and other countries. It contracts Chinese manufacturers to assemble its devices from those parts and components. Once finished, the devices are exported from China to over fifty countries worldwide, including the United States.

It is not clear from the record how many different inputs, parts, or components (collectively "components") are included in each of the asserted devices. The record also does not contain evidence as to the respective values, prices, or costs of all of the components. The ITC addresses only four components in its domestic industry analysis: a backbone material, a rubber, microcontrollers, and a pigment.[2] Of those components, the backbone material, rubber, pigment, and the wafers used in the microcontrollers are manufactured in the United States, but the record is not clear whether the U.S. suppliers of the components are also the manufacturers of the components. Apparently, all other components of the devices are produced and sourced abroad.

Lelo Inc. is a California corporation having its principle place of business in San Jose, California. Leloi AB is headquartered in Stockholm, Sweden, and is a majority shareholder of Lelo Inc. and Lelo Shanghai Trading Ltd. (collectively "LELO"). LELO imports three kinesiotherapy devices into the United States.

## I. U.S. DOMESTIC INDUSTRY

Standard Innovation filed a § 337 complaint alleging that LELO imported kinesiotherapy devices and components thereof that infringed its '605 Patent. An ITC Administrative Law Judge ("ALJ") issued an Initial

---

[2] We refer to these components in general terms because Standard Innovation has requested that detailed information about the components remain confidential.

Determination in which he construed three claim terms of the '605 Patent and determined that all of the accused devices meet at least one claim of the '605 Patent. *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Initial Determination at 50 (Jan. 8, 2013) ("*Initial Determination*"). The ALJ rejected LELO's arguments that the independent claims of the '605 Patent are invalid as anticipated, obvious, or indefinite under 35 U.S.C. §§ 102, 103, 112. *Id.* at 79.

Despite its findings on infringement and validity, the ALJ determined that a violation of § 337 had not occurred because Standard Innovation failed to satisfy the § 337 domestic industry requirements. *Id.* The ALJ rejected Standard Innovation's arguments that its U.S. purchase of the four components constituted a "significant investment in plant and equipment," or a "substantial investment in its exploitation, including engineering, research and development, or licensing," under prongs (A) and (C), respectively, of the § 337 domestic industry requirement. *Id.* at 71.

Specifically, the ALJ concluded that Standard Innovation's U.S. purchases were not relevant to a prong (A) analysis because Standard Innovation failed to establish what portion, if any, the purchase price actually contributed towards a domestic investment in plant or equipment. *Id.* at 73–74. The ALJ also decided that the components were off-the-shelf items and not relevant to prong (C) because there was no proof that the components were developed specifically for Standard Innovation's devices, or what portion, if any, of the purchase price was allocable to research and development costs incurred in the development of the components. *Id.* at 74–75.

Further, the ALJ determined that even if the purchases were relevant, they were neither "substantial" nor "significant" under prongs (A) or (C). *Id.* at 75. The total

purchase prices accounted for less than five percent of the total raw cost of the devices. *Id.* at 76.[3]

## II.  COMMISSION DETERMINATION

The Commission reviewed the ALJ's determination, revised one of the ALJ's claim constructions, and determined that one of the accused devices does not meet the claims of the '605 Patent. *Comm'n Op.* at 2.  The Commission affirmed the remainder of the ALJ's determinations as to claim construction, infringement, and validity. *Id.* at 2.

The Commission, however, reversed the ALJ's domestic industry determination, finding that "Standard Innovation has satisfied the domestic industry requirement based on its expenditures on components produced domestically that are critical to [its devices]." *Id.* at 26. The Commission rejected the ALJ's economic prong analysis because Standard Innovation "established that the components were critical for [its devices], which the ALJ found to be protected by the patent. This is sufficient for us to consider the component expenses in our economic prong analysis." *Id.* at 27–28.  The Commission deter-

---

[3]  The ALJ made numerous other quantitative findings that paint a more complete picture of Standard Innovation's domestic investments, *e.g.*, per-unit costs of the microcontroller and other components, per-unit costs of the domestically-sourced components compared to per-device revenue, total sales of the devices, and Standard Innovation's aggregate domestic investments. *Initial Determination* at 76.  These findings have, however, been marked confidential.  This Court has repeatedly explained that over-marking information as confidential places significant limits on this Court's ability to address the relevant issue in a public opinion.  We note that these findings show, at most, modest investments.

mined, however, that Standard Innovation's sales and marketing data were not relevant to the establishment of a domestic industry under prong (C). *Id.* at 29–30, n. 8.

The Commission rejected the ALJ's finding that the purchases were neither "substantial" nor "significant" under prongs (A) or (C). Conceding that the purchases represented "a relatively modest proportion of domestic content," *id.* at 34, the Commission determined that the "contribution of the components at issue from a qualitative standpoint is indeed significant," *id.* at 35. The Commission found that the ALJ had failed to give "due consideration to the critical nature of the components to the patented products in the context of the industry and the company." *Id.* at 34. The Commission reasoned that the components were "crucial" because the backbone and finishing materials were finalized after extensive effort and experimentation, the backbone material specifically allowed for beneficial flexibility and resilience, the microcontrollers enabled the devices to "function as a vibrator (particularly as a vibrator with multiple modes)" by controlling "motor and mode selection." *Id.* at 35–36. The Commission thus determined that the domestic purchases were significant entirely based on their qualitative contribution to the devices.

LELO timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(6).

## DISCUSSION

Under 19 U.S.C. § 1337(c), we review ITC Final Determinations in accordance with the Administrative Procedure Act (APA), setting aside conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). We review questions of law, as interpreted and applied by the ITC, de novo and questions of fact for substantial evidence. *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d

1354, 1361–62 (Fed. Cir. 1999); *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013).

This appeal turns on the single question of whether qualitative factors alone are sufficient to satisfy the "significant investment" and "significant employment" requirements of § 337. To answer this question, we look first to the plain meaning of the statute. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009); *Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 438 (1999).

A claimant asserting patent rights under § 337 must satisfy the "domestic industry" requirement set out in the statute and establish, "with respect to the articles protected by the patent," that there is:

> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

The plain text of § 337 requires a quantitative analysis in determining whether a petitioner has demonstrated a "significant investment in plant and equipment" or "significant employment of labor or capital." First, the terms "significant" and "substantial" refer to an increase in quantity, or to a benchmark in numbers. The plain meaning of an "investment" is "an expenditure of money for income or profit or to purchase something of intrinsic value." Webster's Third New International Dictionary 1190 (1986). An "investment in plant and equipment" therefore is characterized quantitatively, *i.e.*, by the amount of money invested in the plant and equipment. Similarly, "capital" is "a stock of accumulated goods" and "labor" is "human activity that produces goods or provides

the services in demand in an economy." *Id.* at 332, 1259. All of the foregoing requires a quantitative analysis in order to determine whether there is a "significant" increase or attribution by virtue of the claimant's asserted commercial activity in the United States.

Prior ITC § 337 investigations confirm that a § 337 analysis is quantitatively based. The ITC first addressed the relevant domestic industry requirement in *Certain Cabinet Hinges*, and found that the word "significant" denoted "an assessment of the relative importance of the domestic activities." *Certain Concealed Cabinet Hinges and Mounting Plates*, Inv. No. 337-TA-289, 1990 WL 10608981, Comm'n Op. at 11 (Jan. 8, 1990). The ITC reviewed the term "relative importance" in quantitative terms, determining that the complainant's total dollar amount of investment was not "significant" relative to its overall investment with respect to the articles at issue. *Id.* at 11–12. In *Certain Pressure Transmitters*, the ITC determined that the § 337 requirement was satisfied based on evidence concerning revenue spent on a manufacturing facility, equipment, research and development, and licensing, as well as reviewing the total number of people employed at its facility. *Certain Pressure Transmitters*, Inv. No. 337-TA-304, USITC Pub. 2392, Comm'n Op. at 14 (Mar. 19, 1990).

The ITC has argued it has previously based a domestic industry determination on qualitative factors. *See, e.g., Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, USITC Pub. 4005, Comm'n Op. at 24–25 (June 21, 2007) ("*Certain Male Prophylactics*"). But the cases it cites do not stand for the proposition the qualitative data alone can satisfy the domestic industry requirements. For example, in *Certain Male Prophylactics,* the ITC examined the economic impact of subcontractor domestic operations noting that, among other things, those operations reflected a U.S. value added of 34 percent. *Id.* at 26. Other cases relied on by Appellant are similarly unavail-

ing because the domestic industry requirement was not satisfied in those cases and cannot stand for the proposition that qualitative factors alone can support a domestic industry finding. *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 17 (Feb. 17, 2011); *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, USITC Pub. No. 4120, Comm'n Op. at 17 (Apr. 24, 2008).

The ITC argues that this case is similar to *Certain Male Prophylactics*, because Standard Innovation's U.S. purchases of components are similar to "subcontracted components." *Comm'n. Op.* at 26. This argument is unavailing. In *Certain Male Prophylactics*, the subcontractor provided a detailed accounting of the number of hours its employees spent working specifically on the complainants. The data permitted the ITC a basis to compute the magnitude of the "employment of labor." *Id.* at 25. In addition, the subcontractor provided an accounting of the amount of investment it made in equipment that its employees used to perform the contracted services. *Id.*

In this case, the U.S. suppliers are neither contractors nor subcontractors. They are retailers and the components are off-the-shelf. There is no evidence of any investment made in capital or labor as a result of the purchased components. Standard Innovation provides only generic purchase prices it paid for the off-the-shelf items. These pricing data do not reflect the magnitude of labor expended to produce the components, or the amount the suppliers invested in their equipment to fulfill Standard Innovation's orders. The record contains no data indicating the share of labor and capital costs attributable solely to purchases made by Standard Innovation.[4] The

---

[4] The ALJ apparently attempted to address this issue by subtracting an approximate amount spent on

ITC has generally applied prong (B) of the domestic industry requirement to capital investments in domestic facilities. *See, e.g., Certain Integrated Circuit Chipsets and Products Containing the Same*, Inv. No. 337-TA-428, ALJ Order at 2 (May 4, 2000); *Certain Cutting Tools for Flexible Plastic Conduit and Components Thereof*, Inv. No. 337-TA-344, ALJ Order at 7 (Feb. 10, 1993).

The Commission determined that Standard Innovation's investment and employment under prongs (A) and (B) were quantitatively "modest," *Comm'n Op.* at 34, which we take to mean "insignificant." The Commission also found that Standard Innovation did not establish prong (C). *Id.* at 29–30, n.8. We agree with the Commission's finding that investment and employment under prongs (A) and (B) were modest and insignificant. The Commission erred when it disregarded the quantitative data to reach its domestic industry finding based on qualitative factors. Qualitative factors cannot compensate for quantitative data that indicate insignificant investment and employment. As such, Standard Innovation did not establish a "significant" "investment" or "employment" under prongs (A) or (B), and did not set forth evidence of relevant investments under prong (C). Accordingly, Standard Innovation did not satisfy the domestic industry requirement of § 337.

---

foreign activities. *Initial Determination* at 72. Though important, the ALJ's analysis is incomplete as it does not account for the value expended on *relevant* domestic activities, as opposed to total profit or total general administrative costs. In any event, the ITC also failed to allocate profits or revenue attributed to relevant domestic activities. *Comm'n Op.* at 33–34.

CONCLUSION

We hold that qualitative factors alone are insufficient to show "significant investment in plant and equipment" and "significant employment of labor or capital" under prongs (A) and (B) of the § 337 domestic industry requirements. The purchase of so called "crucial" components from third-party U.S. suppliers are insufficient to satisfy the "significant investment" or "significant employment of labor or capital" criteria of § 337 where there is an absence of evidence that connects the cost of the components to an increase of investment or employment in the United States.

Because the ITC's assessment of domestic industry contravenes § 337, we hold that the ITC's Final Determination was not in accordance with law. Accordingly, we reverse the ITC's Final Determination.[5]

**REVERSED**

---

[5] On appeal, LELO also challenges the ITC's Final Determination on claim construction and indefiniteness. Because our holding on the domestic industry requirement resolves this appeal, we do not reach those issues.